David R. GROOBERT, Plaintiff,

v.

**PRESIDENT AND DIRECTORS OF GEORGETOWN COLLEGE,** Defendant.

No. CIV.A.01–0235(RMU).

United States District Court, District of Columbia.

June 27, 2002.

---

Patrick M. Regan, Karen M. Doherty, Regan, Halperin & Long, P.L.L.C., Washington, DC, for Plaintiff.

Carolyn I. Stein, Barry D. Trebach, Bonner, Kiernan, Trebach & Crociata, Washington, DC, for Defendant.

## *MEMORANDUM OPINION*

URBINA, District Judge.

### Denying the Defendant's Motion for Partial Summary Judgment; Allowing the Plaintiff to File His First Surreply; Striking All Subsequent Briefs

## I. INTRODUCTION

This matter comes before the court on the defendant's motion for partial summary judgment regarding the plaintiff's claim for economic damages. David Groobert ("the plaintiff" or "Mr. Groobert") brings this action for alleged negligence, wrongful death, and survival. The defendant is Georgetown College, doing business as the Georgetown University Medical Center ("GUMC"). The plaintiff alleges that the defendant's negligent acts and/or omissions in failing to properly diagnose or treat his wife, Myra Groobert ("Mrs.Groobert"), resulted in her death at GUMC. The plaintiff states that his family incurred expenses and lost any and all damages recoverable under the District of Columbia Wrongful Death Statute, D.C.Code § 12–101 *et seq.* Additionally, the plaintiff alleges that the decedent's estate lost the probable future earnings and any other economic and non-economic damages recoverable under the applicable District of Columbia law, and that her minor child lost "the care, comfort, education, guidance and support" and all other damages recoverable under the District of Columbia Survival Act.

The defendant filed a motion for partial summary judgment regarding the plaintiff's claim for economic damages, arguing that the plaintiff's expert witnesses are unreliable and that their testimony is inadmissible pursuant to Federal Rule of Evidence 702. After reviewing the submissions of both parties, the court concludes that the plaintiff's experts are reliable and that the plaintiff's claim for lost earnings survives the defendant's motion. Accordingly, the court denies the defendant's motion for partial summary judgment.

## II. BACKGROUND

On March 31, 2000, Mrs. Groobert entered the emergency room of GUMC with complaints of shoulder pain, neck pain, and crusty lesions on her right arm. Compl. at 2. GUMC diagnosed her with "musculoskeletal strain" and released her after three hours. *Id.* Mrs. Groobert returned to GUMC the following day with complaints of "prominent, raised, ulcerated areas over the length of her right extremity, severe pain and soft tissue swelling." *Id.* Mrs. Groobert's condition progressively deteriorated and she was transferred to the intensive care unit with evidence of renal failure with anuria, metabolic acidosis, and respiratory insufficiency. *Id.* at 3. Mrs. Groobert went into refractory shock on April 2, 2000 at around 3:00 p.m., and

she was pronounced dead at 3:15 p.m. that same day. *Id.*

On January 30, 2001, Mr. Groobert filed this lawsuit on his wife's behalf. He brings claims for medical negligence, wrongful death, and survival, seeking both compensatory damages and lost future earnings. *Id.* at 3–5. Before her death, Mrs. Groobert worked as a part-time free-lance photographer. Def.'s Statement of Material Facts Not in Dispute ("Def.'s Statement") at 1. She was the owner and operator of Myra Miller Photography and specialized in various forms of photogra-phy such as portraits, assignments, and stock photography. Mot. for Partial Summ. J. at 2. Stock photography "in-volves the marketing and sales of photo-graphs taken by the photographer to enti-ties in need of images for uses such as advertising." *Id.* Stock photographers of-ten join an agency, which compiles images from individual photographers and main-tains a library from which potential pur-chasers select their photographs. *Id.*

In 1993, Mrs. Groobert earned gross profits of $29,452 and net profits of $19,018 from her photography business. Def.'s Statement at 1. Her profits dropped in 1994 after she became pregnant with her son Steven and decreased her workload. Pl.'s Opp'n to Mot. for Partial Summ. J. ("Pl.'s Opp'n") at 4. That year, she earned gross profits of $17,482 and net profits of $7,104. Def.'s Statement at 2. She contin-ued her professional photography business after the birth of her son, but only on a limited, part-time basis. Pl.'s Opp'n at 4. In 1998, Mrs. Groobert's gross profits had dropped to $5,504 with net profits of $2,083, but had increased in 1999 to $14,794 in gross profits and $5,740 in net profits. Def.'s Statement at 2.

The plaintiff alleges that Mrs. Groobert planned to return to work full-time in the fall of 2000, specializing in stock photogra-phy. Pl.'s Opp'n at 4. The plaintiff offers expert testimony to support his claim that Mrs. Groobert would have earned $250,000 a year within three to four years, ultimate-ly earning between $250,000 and $400,000 a year in annual gross income from stock photography. *Id.* at 11, Ex. E (Feingersh Dep.) at 175. The plaintiff's experts also offer opinions regarding Mrs. Groobert's stock photography-related expenses. *Id.* at 16.

Jonathen Feingersh ("Mr. Feingersh"), the plaintiff's first expert, is the president and owner of his own production company, Jon Feingersh Photography. *Id.* Ex. E (Feingersh Dep.) at 5. He works with at least six agencies and has earned 100 per-cent of his income for the last 12 years from stock photography. Pl.'s Opp'n at 10. He attended the Illinois Institute of Tech-nology, Syracuse University, and the Art Center College of Design. *Id.* Mr. Feing-ersh gives lectures across the country on the subject of stock photography and stud-ies industry trends through current adver-tising and visuals from at least 60 different publications each month. *Id.* He watches stock agency websites, reads the Wall Street Journal and stock agency cata-logues, and talks to other photographers on a regular basis. *Id.* Mrs. Groobert worked as Mr. Feingersh's photography assistant from 1987 to 1990 and she main-tained a "mentor/mentoring relationship" with Mr. Feingersh until her death. Pl.'s Opp'n Ex. G (Feingersh Aff.) at 2; Mot. for Partial Summ. J. at 7.

James Pickerell, the plaintiff's second expert, is a stock photographer with more than 40 years of experience in the indus-try. Pl.'s Opp'n at 15. He is a partial owner of a stock photography agency named Stock Connection, which represents 250 to 300 photographers. *Id.* He publish-ed a book about the stock photography business called *Negotiating Stock Photo*

*Prices* and he publishes a newsletter called *Selling Stock.* Pl.'s Opp'n Ex. L (Pickerell Aff.) at 2. He has conducted a survey for the last few years to calculate the average expenses of stock photographers. Pl.'s Opp'n at 16. Mr. Pickerell's 2001 survey, based on photographers' year 2000 income, estimated that the average expenses of a stock photographer are 43 percent of gross income or revenue. Mot. for Partial Summ. J. at 15. This number is based on responses from 97 stock photographers, 89 of whom provided figures relating to their expenses. *Id.*

The plaintiff's third expert is Richard Lurito, Ph.D. ("Dr.Lurito"), an economist who has testified at about 500 trials as an economic consultant. Mot. for Partial Summ. J. Ex. G (Lurito Dep.) at 3–4. Dr. Lurito relies solely on the testimony of Mr. Feingersh and Mr. Pickerell to calculate Mrs. Groobert's future net income. Mot. for Partial Summ. J. at 17.

On March 20, 2002, the defendant filed a motion for partial summary judgment seeking to prevent the plaintiff from collecting damages for Mrs. Groobert's lost future earnings. *Id.* at 1. The defendant contends that the plaintiff's experts are unreliable and that their testimony is therefore inadmissible at trial, thus leaving the plaintiff with insufficient evidence to support his claim for economic damages. *Id.* at 3. The court now turns to that motion.

### III. ANALYSIS

#### A. Legal Standards

##### 1. Legal Standard for Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-al fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene,* 164 F.3d at 675. If the evidence "is merely colorable,

or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

### 2. Legal Standard for Reliability of Expert Testimony

Expert testimony is admissible "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. A witness may qualify as an expert through knowledge, skill, experience, training, or education. *Id.* Rule 702 requires trial courts to act as "gatekeepers" to ensure that the methodology underlying the expert testimony is valid and the expert's conclusion is based on "good grounds." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also Meister v. Med. Eng'g Corp.,* 267 F.3d 1123, 1127 (D.C.Cir.2001).

▉▉▉ The trial court's gatekeeping obligation applies not only to scientific testimony but to all expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Trial courts may apply several factors in assessing reliability, such as (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. These factors are neither exclusive nor dispositive, and their application depends on the particular facts of each case. *Kumho Tire Co.,* 526 U.S. at 150, 119 S.Ct. 1167.

▉▉▉ In matters where these factors do not apply, reliability concerns may focus on personal knowledge or experience. *Id.* at 149, 119 S.Ct. 1167. The gatekeeping inquiry is "flexible" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142, 119 S.Ct. 1167; *see also Gen. Electric Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The inquiry must focus on principles and methodology rather than on the conclusions they generate. *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786; *Ambrosini v. Labarraque,* 101 F.3d 129, 140 (D.C.Cir.1996); *Raynor v. Merrell Pharm. Inc.,* 104 F.3d 1371, 1375 (D.C.Cir. 1997). Trial courts must make certain that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.,* 526 U.S. at 152, 119 S.Ct. 1167. Expert testimony that rests solely on "subjective belief or unsupported speculation" is not reliable. *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. A court may refuse to admit expert testimony if it concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Electric Co.,* 522 U.S. at 146, 118 S.Ct. 512.

### B. The Court Determines that the Plaintiff's Experts Are Reliable

### 1. Jonathen Feingersh's Expert Testimony is Reliable and Admissible

▉▉ In its motion for partial summary judgment, the defendant argues that Mr. Feingersh lacks the requisite degree of reliability required by Federal Rule of Evidence 702. Mot. for Partial Summ. J. at 3. The defendant declares that Mr. Feing-

ersh's personal experience in stock photography is not a sufficient basis for an expert opinion regarding Mrs. Groobert's lost future earnings. *Id.* at 9. The defendant argues that Mr. Feingersh has no training or experience in evaluating the careers of other photographers, and that Mr. Feingersh's personal knowledge of Mrs. Groobert's career is incomplete and insufficient to support a valid expert opinion. *Id.* at 8–9. The defendant contends that Mr. Feingersh bases his conclusions on "occasional anecdotal conversations with her and the photographs that she showed him," which is "the same subjective, conclusory approach disfavored under *Daubert.*" *Id.* at 7.

█ The defendant fails to recognize, however, that the standard under Federal Rule of Evidence 702 is a liberal and "flexible" one, and that personal experience can be a reliable and valid basis for expert testimony. *Kumho Tire Co.,* 526 U.S. at 149, 119 S.Ct. 1167. This is particularly true with non-scientific testimony, where the *Daubert* factors may not apply because the issue is "highly particular and has not attracted scientific scrutiny." *Ambrosini,* 101 F.3d at 134 (holding that courts must consider "other indicia of reliability" when the *Daubert* factors offer limited assistance in evaluating an expert's testimony); *see also Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 245–46 (5th Cir.2002) (holding that the lack of literature on injection-related infections of the joint did not undermine the expert's hypothesis because the trial court could rely on first-hand observations and professional experience to assess the expert's reliability). The Supreme Court has recognized that "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co.,* 526 U.S. at 151, 119 S.Ct. 1167.

█ In this case, the defendant offers no evidence to refute the plaintiff's claim that "expert opinions in an art field simply must be based in large part on the experience and understanding of the expert witness" because "there are no experiments that can be done or peer review in which to engage." Pl.'s Opp'n at 11. Indeed, the defendant acknowledges the absence of reports or studies on the income of stock photographers, but instead refers to the availability of data on photographers in general. Mot. for Partial Summ. J. at 17. Since Mrs. Groobert was allegedly planning to specialize in stock photography, however, information on photographers in general would not aid an expert in calculating her future earnings. The court therefore cannot evaluate Mr. Feingersh's reliability based on such *Daubert* factors as "whether the expert's technique or theory can be or has been tested" or "whether the technique or theory has been subject to peer review and publication" because of the apparent lack of information on the subject. *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. Personal experience is therefore the proper method for assessing the reliability of Mr. Feingersh's expert testimony. *Kumho Tire Co.,* 526 U.S. at 150, 119 S.Ct. 1167.

The defendant also argues that Mr. Feingersh's personal experience is not reliable because he has no training in how to evaluate other photographers. Mot. for Partial Summ. J. at 13. Experts need not possess such a qualification, however, since Rule 702 allows a witness to qualify as an expert through knowledge, skill, experience, training or education. FED. R. EVID. 702. The rule allows for experience such as employment in the field as well as experience in performing tests or studies. *United States v. Ramsey,* 165

F.3d 980, 984 (D.C.Cir.1999) (holding that an expert's testimony regarding the plaintiff's past criminal history satisfied Rule 702 because of his specialized knowledge, education, skill, and experience as an agent of the Drug Enforcement Administration); *United States v. Hankey*, 203 F.3d 1160, 1169–70 (9th Cir.2000) (holding that the trial court properly admitted expert testimony concerning the plaintiff's gang membership since the expert was a 21–year veteran of the police department who had devoted years to working with gangs).

The defendant fails to undermine Mr. Feingersh's extensive experience in stock photography, including 12 years of exclusive work in that field, various speaking engagements and lectures around the country, and his continuous study of industry trends. Pl.'s Opp'n at 10. To support its argument, the defendant refers to Rule 702's Advisory Committee note, which states that "the more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." FED. R. EVID. 702 Advisory Committee's note (citing *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir.1994)). But the defendant's reliance on *O'Conner* is misplaced. The court in *O'Conner* rejected experience-based expert testimony because the expert had only treated five patients with the condition at issue in his 20 years of practice. *O'Conner*, 13 F.3d at 1107. The instant situation is vastly different because Mr. Feingersh has had many years of experience working with stock photographers and studying industry trends.

In addition, the unreliable expert in *O'Conner* did not use the "proper methodology" followed by others in the medical community. *Id.* General acceptance in the community is an important factor in evaluating an expert's methodology and courts particularly emphasize this *Daubert* factor

when reliability focuses on experience. *Kumho Tire Co.*, 526 U.S. at 158, 119 S.Ct. 1167 (stating that experience-based expert testimony was unreliable because there was no indication that others in the industry used the expert's two-factor test); *Meister*, 267 F.3d at 1131 (holding that an expert lacked reliability when "no reasonable scientist would rely on this methodology in the face of voluminous epidemiological evidence to the contrary"); *Raynor v. Merrell Pharm. Inc.*, 104 F.3d 1371, 1375 (D.C.Cir.1997) (rejecting expert testimony because an overwhelming body of evidence utilizing a "sound" methodology pointed in the opposite direction).

Mr. Feingersh's methodology consists of comparing images in Mrs. Groobert's portfolio to the work of other photographers, as well as comparing her to other photographers and assistants in terms of "work ethic, devotion to the field, and artistic and technical ability." Pl.'s Opp'n at 12. He claims that past income is not strongly correlated with future-earnings potential in the stock photography profession, and he therefore chose to disregard that factor in estimating that Mrs. Groobert's future earnings potential would be between $250,000 and $400,000 per year. *Id.*

The defendant's experts came to a different conclusion, with one estimating that Mrs. Groobert would have earned a maximum of $90,000 per year and the other estimating that she would have earned a maximum of $60,000 per year. *Id.* at 13. The court's focus on methodology, however, reveals that the defendant's experts actually utilize an analysis similar to Mr. Feingersh's, despite the disparate conclusions they reached. The defendant's first expert, Paul Henning ("Mr.Henning"), simply combined his experience in the stock photography industry, materials he read about the industry, a review of Mrs. Groobert's portfolio, and information re-

garding her past income to measure Mrs. Groobert's future earnings. *Id.* at 13–14. The only difference between his evaluation and Mr. Feingersh's analysis is that Mr. Henning's analysis focuses on past income, which goes to the weight of the evidence rather than its admissibility. *Ambrosini*, 101 F.3d at 141. The D.C. Circuit has stated that, "by attempting to evaluate the credibility of opposing experts and the persuasiveness of competing studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a factfinder." *Id.; see also Voilas v. Gen. Motors Corp.*, 73 F.Supp.2d 452, 462 (D.N.J.1999) (holding that an expert's failure to evaluate all available options "neither renders his methodology unreliable nor his report inadmissible but, rather, goes to the weight of his testimony"). Jane Kinne ("Ms.Kinne"), the defendant's second expert, also uses a similar methodology, drawing on her 55 years of experience in the industry to estimate the value of Mrs. Groobert's portfolio. Pl.'s Opp'n at 14.

The *Kumho Tire Co.*, *Meister*, and *Raynor* line of precedent deems expert testimony unreliable when an expert chooses to utilize her own unique methodology rather than the proper analysis which is well-known and respected. *Kumho Tire Co.*, 526 U.S. at 157, 119 S.Ct. 1167; *Meister*, 267 F.3d at 1131; *Raynor*, 104 F.3d at 1375–76. In contrast, Mr. Feingersh uses the same methodology as other stock photography "experts" in the field. The D.C. Circuit's rule is that "when the underlying basis or methods of an expert's opinion are of a type reasonably relied on by experts in the field, the court must allow the opinion to be assessed by the factfinder, even if the opinion reaches a novel conclusion." *Ambrosini*, 101 F.3d at 138 (citing *Mendes–Silva v.*

*United States*, 980 F.2d 1482, 1485 (D.C.Cir.1993)).

The defendant contends that the methodology of its own experts is irrelevant to the admissibility of Mr. Feingersh's testimony, since the plaintiff has the burden of proof at trial and therefore the defendant "has no obligation to present any evidence at the time of trial." Def.'s Reply at 15. The court rejects this argument since the validity of Mr. Feingersh's methodology depends on an examination of other stock photography experts. The plaintiff properly satisfied its burden of proof by demonstrating that such comparative analyses and experience-based studies are generally accepted in the industry. Similarly, one court admitted an expert's calculation of future earnings because the expert's principles and methods constituted a "commonly accepted practice," especially since the defendant's own expert used the same methodology in reaching his opinion. *Andrade Garcia v. Columbia Med. Ctr.*, 996 F.Supp. 617, 623 (E.D.Tex.1998).

The defendant also argues that Mr. Feingersh's testimony is unreliable because he is unfamiliar with certain aspects of Mrs. Groobert's career, such as "the volume of her production of stock photos over time, the number of photographs she sent to an agency at any time" or "whether she was represented by any agencies other than 'Liaison' during her career." Mot. for Partial Summ. J. at 9. The court rejects this argument because the defendant's own experts were unaware of these facts and still arrived at a future-earnings estimate. Mr. Feingersh's choice to weigh certain factors in his analysis while deeming others unimportant goes to the weight of the evidence rather than its admissibility. *Ambrosini*, 101 F.3d at 141.

Moreover, an expert's methodology fails the reliability requirement when there is "an analytical gap between the data and

the opinion proffered." *Gen. Electric Co.*, 522 U.S. at 146, 118 S.Ct. 512 (holding that the district court did not abuse its discretion in rejecting expert testimony because the expert failed to show any causal link between the plaintiff's exposure to PCB's and his illness); *see also Padillas v. Stork–Gamco, Inc.*, 2000 WL 1470210, at *3 (E.D.Pa.2000) (rejecting expert testimony because such a gap existed where the expert addressed the question of *when* to install a guard on a chicken-processing machine but gave no guidance as to *how* to design, install, or fabricate such a guard). In contrast, there is a valid connection between Mr. Feingersh's methodology and his conclusions in this case since he simply compared Mrs. Groobert's portfolio to that of other photographers and calculated her income according to the earnings of others with similar work.

Finally, the defendant argues that Mr. Feingersh's reliance on "inadmissible hearsay" renders his testimony unreliable. Def.'s Reply at 3. The defendant contends that the plaintiff can verify Mrs. Groobert's alleged plans to return to work full-time solely through statements by her family members. *Id.* Since the defendant submits that these statements are inadmissible at trial, it asserts that Mr. Feingersh's reliance on these statements undermines the reliability of his expert opinion. *Id.* Even assuming *arguendo* that such statements are inadmissible,[1] however, Federal Rule of Evidence 703 provides that, "if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." FED. R. EVID. 703. Both Mr. Feingersh and the

defendant's experts calculate Mrs. Groobert's future income as if she were intending to resume her career full-time (rather than to continue on a part-time basis), which is a reasonable approach because the experts must compare Mrs. Groobert to other full-time stock photographers.

The plaintiff correctly argues that how much Mrs. Groobert planned to work in the future is a disputed material fact properly left to the jury. Pl.'s Statement of Material Facts in Dispute ("Pl.'s Statement") at 1. In *Daubert*, the Supreme Court held that "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. Other district courts have also permitted expert testimony based on assumptions of fact and "shaky evidence" as long as the underlying methodology is valid. *E.g., Walker v. Yellow Freight Systems, Inc.*, 1999 WL 757022, at *8 (E.D.La. 1999) (holding that expert testimony regarding future wages was still reliable even if based on an assumption that the decedent would attend and complete a four-year college because such a "potential shortcoming" of the opinion "does not justify its exclusion."); *Coles v. Jenkins*, 1998 WL 964506, at *4 (W.D.Va.1998) (holding that expert testimony was necessarily predicated on some assumptions regarding how long the plaintiff would have lived and continued working since those questions "cannot be definitively answered" and are better addressed by allowing cross-examination at trial). Similarly, while the court does not mean to imply that the plaintiff's expert would be relying on "shaky evidence," the question of Mrs. Groobert's

---

1. The court anticipates that motions *in limine* will determine the exact contours of each expert's testimony before trial.

future career plans cannot be answered with absolute certainty and the issue is properly left to the trier of fact.

The court cannot penalize the plaintiff for the lack of scientific or academic studies and published reports on the topic of stock photographer incomes because if it did, no plaintiff could ever present their own tests or recover damages relating to this industry. *Benedi v. McNeil–P.P.C., Inc.,* 66 F.3d 1378, 1385 (4th Cir.1995) (holding that expert testimony was reliable despite the lack of studies or tests because a "defendant should not be allowed to escape liability simply because ... there are, as yet, no epidemiological studies concerning [this specific subject area]"). Those who have observed the work of others in the industry are in the best position to evaluate Mrs. Groobert's skills and earnings potential. *Hankey,* 203 F.3d at 1169–70 (reasoning that an expert on gang membership properly relied on his experience working with gangs and the "street intelligence" he acquired, because "how else can one obtain this encyclopedic knowledge of identifiable gangs?"). For all these reasons, the court concludes that pursuant to Federal Rules of Evidence 702 and 703, Mr. Feingersh's expert testimony is reliable and admissible.

**2. James Pickerell's Expert Testimony is Reliable and Admissible**

The defendant contends that Mr. Pickerell's expert testimony is unreliable because his opinion is based solely on "a flawed survey and his unsubstantiated opinion." Mot. for Partial Summ. J. at 14. The court first addresses the defendant's arguments regarding Mr. Pickerell's personal experience since this requires the same analysis as described earlier with respect to Mr. Feingersh.

The defendant does not challenge Mr. Pickerell's 40 years of experience in stock photography, but contends that Mr. Picke-

rell's reliance on personal experience is not a valid and reliable basis for his opinion. *Id.* at 16. The court rejects the defendant's contention that Mr. Pickerell "cannot explain how his experience leads to the conclusion reached," since Mr. Pickerell derived his estimates from his employment in, his research on, and his regular interactions with others in the industry. Pl.'s Opp'n at 15. Indeed, his research in the field included a published book and a newsletter. *Id.* The defendant's own experts support Mr. Pickerell's qualifications and expertise. Indeed, Mr. Henning admits that he subscribes to Mr. Pickerell's online newsletter and Ms. Kinne agrees that Mr. Pickerell is "qualified to offer opinions about matters relevant to this case." *Id.* (Pickerell Dep.) at 37; Pl.'s Supplemental Opp'n to Def.'s Mot. for Partial Summ. J. Regarding Pl.'s Claim for Economic Damages ("Pl.'s Surreply") (Kinne Dep.) at 13. Mr. Pickerell's personal experience is therefore a reliable basis for his expert testimony and the trier of fact is entitled to assess his credibility.

Regarding Mr. Pickerell's survey on stock photography-related expenses, the court rejects the defendant's argument that Mr. Pickerell's conclusions are flawed because "he has no training in scientific method that could be used in preparing the survey, distributing the survey or analyzing the results." Mot. for Partial Summ. J. at 16. The court must focus on Mr. Pickerell's methodology which consists of sending out survey questionnaires to photographers and applying "basic algebra" to calculate the average amount of expenses according to the responses he obtained. Pl.'s Opp'n at 16.

Although only 97 photographers responded to the survey, this fact does not justify excluding Mr. Pickerell's testimony completely, especially since he included a caveat stating that "the results are proba-

bly far from being statistically valid." Mot. for Partial Summ. J. at 15. One court admitted expert testimony regarding lost future earnings even though the expert merely assumed that the plaintiff's income would decrease by 10 percent per year. *Coles,* 1998 WL 964506, at *4. That court held that "an expert may rely on reasonable assumptions as to future earnings," and the "defendant's concern about the ten percent figure would better be addressed by allowing cross-examination on the subject." *Id.; see also Walker,* 1999 WL 757022, at *8 (holding that an expert satisfied the reliability requirement despite some "optimistic projections" and assumptions because "the perceived flaws in an expert's testimony often should be treated as matters properly to be tested in the crucible of the adversarial system").

The defendant's experts do not refute the validity of Mr. Pickerell's methodology and Mr. Henning merely states that Mr. Pickerell's conclusion is not necessarily representative of stock photographers in general. Pl.'s Opp'n at 18. Mr. Henning actually gave weight to Mr. Pickerell's survey, agreeing that he did not know anyone who had performed a more detailed analysis of the earnings and revenue of stock photographers than Mr. Pickerell. *Id.* (Pickerell Dep.) at 36. Mr. Henning also did not know anyone else who has performed any of these surveys in the last five years. *Id.* Mr. Henning is unaware of the existence of any more reliable data in the industry, admitting that, "collectively, I rely upon everything that I read regarding this industry, including Mr. Pickerell." *Id.* at 3, 45. As discussed previously, the D.C. Circuit's line of precedent supports allowing Mr. Pickerell to testify as an expert because his methodology is "reasonably relied on by experts in the field." *Ambrosini,* 101 F.3d at 138.

Mr. Pickerell's survey does not contain an "analytical gap between the data and his opinion that is simply too great," such as in *Meister,* where one of the experts "failed to show any nexus between [the plaintiff's] atypical symptoms and her breast implants; the mere simultaneous existence of the two clearly is not the appropriate methodology." *Meister,* 267 F.3d at 1128; *see also Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970 (10th Cir.2001) (deeming an expert unreliable because although the expert was a board-certified orthopedic surgeon, the topic at issue "was not within the reasonable confines of her subject area"). In contrast, Mr. Pickerell's testimony cannot be excluded simply because there is a lack of other studies or surveys in the industry and because he did not receive a large number of responses. Unlike the case in *Ralston,* stock photography is Mr. Pickerell's area of expertise, and the court agrees with the plaintiff that "the purpose of Mr. Pickerell's testimony is simply to discuss stock photography in general" and to render an opinion that "Mrs. Groobert more likely than not would have incurred expenses similar to the average stock photographer." Pl.'s Opp'n at 16. In sum, the court rules that Mr. Pickerell's testimony is sufficiently reliable to satisfy Federal Rule of Evidence 702. The jury—not this court on a motion for partial summary judgment—shall weigh the issue of his credibility.

### 3. Dr. Richard Lurito's Expert Testimony is Reliable and Admissible

Lastly, the defendant argues that Dr. Richard Lurito's expert testimony is invalid because it is based on the "unreliable, personal opinions of Mr. Feingersh and Mr. Pickerell." Mot. for Partial Summ. J. at 18. The court rejects this argument since the testimony of Mr.

Feingersh and Mr. Pickerell is clearly reliable and admissible. Assuming *arguendo* that Dr. Lurito was relying on inadmissible testimony, Federal Rule of Evidence 703 validates his opinion because he uses information "reasonably relied upon by experts in the particular field." FED. R. EVID. 703. The absence of reports or studies on stock photography leaves Dr. Lurito no choice but to base his calculations on the personal experience of stock photographers as well as the only recent survey available. Dr. Lurito's choice not to weigh Mrs. Groobert's tax returns, containing a record of her past income, goes to the credibility of the expert rather than his reliability. Pl.'s Opp'n at 21. The court therefore admits the testimony of Dr. Richard Lurito.

For all these reasons, the court concludes that the plaintiff's experts are reliable and admissible pursuant to Federal Rules of Evidence 702 and 703 and their testimony creates genuine issues of material fact regarding Mrs. Groobert's lost future earnings. FED. R. CIV. P. 56(c). Since the plaintiff has met his requisite burden of showing the existence of such genuine issues, the court denies the defendant's motion for partial summary judgment regarding the plaintiff's claim for economic damages.

## C. The Court Allows the Plaintiff to File His First Surreply But Does Not Allow the Filing of Any Additional Briefs

 The standard for granting leave to file a surreply is "whether the party making the motion would be unable to contest matters presented to the court

for the first time in the opposing party's reply." *Lewis v. Rumsfeld,* 154 F.Supp.2d 56 at 61 (D.D.C.2001). The court may permit the filing of a surreply at its discretion. *American Forest & Paper Ass'n v. United States Envtl. Prot. Agency,* 1996 WL 509601, at *3 (D.D.C.1996).

 The court allows the plaintiff to file his first surreply because it addresses a new matter presented by the defendant's reply.[2] *Id.;* Pl.'s Surreply. The defendant's reply addresses the issue of hearsay, which the defendant did not raise in its motion for partial summary judgment. Def.'s Reply at 1–7. The court therefore allows the plaintiff to respond to the defendant's hearsay argument in his first surreply. Additionally, the plaintiff's first surreply contains the deposition of Ms. Kinne, which was not available at the time the plaintiff filed his opposition to the defendant's motion for partial summary judgment. Pl.'s Surreply Ex. C (Kinne Dep.). The court also allows the plaintiff to file this portion of his first surreply because the inclusion of Ms. Kinne's deposition would not be "unduly prejudicial" to the defendant. *American Forest & Paper Ass'n,* 1996 WL 509601 at *3.

But the court strikes the defendant's proposed reply to the surreply since it repeats issues the defendant should have raised in its original reply. Def.'s Reply to Pl.'s Supplemental Opp'n to Def.'s Mot. for Partial Summ. J. Regarding Pl.'s Claim for Economic Damages. The defendant merely reiterates the hearsay argument laid out in its reply. *Id.* The court also strikes the plaintiff's proposed second surreply since

**2.** The court admonishes the plaintiff, however, for not filing a motion for leave to file a surreply. Although the Federal Rules of Civil Procedure and this district's Local Civil Rules are silent on this issue, it is standard practice for a party seeking to file a surreply to move the court for leave to file such a surreply.

*See, e.g., Longwood Village Restaurant, Ltd. v. Ashcroft,* 157 F.Supp.2d 61, 68 n. 3 (D.D.C. 2001); *Cramer Prods. v. Int'l Comfort Prods.,* 1990 WL 58711 at *2 (D.Kan.1990); *Arakelian v. Nat'l Western Life Ins. Co.,* 126 F.R.D. 1, 3 (D.D.C.1989).

it repeats the hearsay argument that the plaintiff should have discussed in his first surreply. Pl.'s Second Supplemental Opp'n to Def.'s Mot. for Partial Summ. J. Regarding Pl.'s Claim for Economic Damages. The court also refuses to allow the filing of the defendant's proposed reply to the plaintiff's second surreply since the defendant does not raise or respond to any new matters. Def.'s Reply to Pl.'s Second Supplemental Opp'n to Def.'s Mot. for Partial Summ. J. Regarding Pl.'s Claim for Economic Damages. Therefore, the court allows the plaintiff to file his first surreply but strikes all the subsequent briefs.

## IV. CONCLUSION

For all these reasons, the court denies the defendant's motion for partial summary judgment. The court also allows the plaintiff to file his first surreply but strikes all subsequent briefs. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 27 day of June, 2002.

### *ORDER*

DENYING THE DEFENDANT'S MOTION FOR PAR-TIAL SUMMARY JUDGMENT; ALLOWING THE PLAINTIFF TO FILE HIS FIRST SURREPLY; STRIKING ALL SUBSEQUENT BRIEFS

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously issued this _____ day of June, 2002, it is

**ORDERED** that the defendant's motion for partial summary judgment is **DE-NIED**; and it is

**FURTHER ORDERED** that the plaintiff is allowed to file his first surreply; and it is

**ORDERED** that the court **STRIKES** the defendant's proposed reply to the first surreply, the plaintiff's proposed second surreply, and the defendant's proposed reply to the second surreply.

**SO ORDERED**.